UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

**EMILY GARCIA**,

                Plaintiff,

v.

**CAROLYN COLVIN, Acting Commissioner of Social Security**,

                Defendant.

Case No. 3:15-cv-00352-KI

OPINION AND ORDER

    George J. Wall
    1336 E. Burnside St., Ste. 130
    Portland, OR 97214

        Attorney for Plaintiff

    Billy J. Williams
    United States Attorney
    District of Oregon

Page 1 - OPINION AND ORDER

Janice E. Hebert
Assistant United States Attorney
1000 SW Third Ave., Ste. 600
Portland, OR 97204-2902

Heather Griffith
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Ave., Ste. 2900 M/S 221A
Seattle, WA 98104-7075

      Attorneys for Defendant

KING, Judge:

Plaintiff Emily Garcia brings this action pursuant to section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner denying plaintiff's application for supplemental security income benefits ("SSI"). I reverse the decision of the Commissioner and remand for a finding of disability.

## BACKGROUND

Garcia filed an application for SSI on April 19, 2011.[1] The application was denied initially and upon reconsideration. After a timely request for a hearing, Garcia, represented by counsel, appeared and testified before an Administrative Law Judge ("ALJ") on October 23, 2013.

On November 15, 2013, the ALJ issued a decision finding Garcia is not disabled within the meaning of the Act and therefore not entitled to benefits. This decision became the final

---

[1] Garcia also filed an application for period of disability and disability insurance benefits, but she withdrew that request at her hearing.

decision of the Commissioner when the Appeals Council declined to review the decision of the ALJ on February 9, 2015.

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1). In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability. The evaluation is carried out by the ALJ. The claimant has the burden of proof on the first four steps. *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007); 20 C.F.R. §§ 404.1520 and 416.920. First, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R.

§§ 404.1520(b) and 416.920(b).  If the claimant is engaged in such activity, disability benefits are denied.  Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments.  A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities[.]"  20 C.F.R. §§ 404.1520(c) and 416.920(c).  If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d) and 416.920(d).  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.  If the impairment is not one that is presumed to be disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past.  If the claimant is able to perform work she performed in the past, a finding of "not disabled" is made and disability benefits are denied.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience.  The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities.  *Parra*, 481 F.3d at 746.  The claimant is entitled to disability benefits only if he is not able to perform other work.  20 C.F.R. §§ 404.1520(g) and 416.920(g).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards.  *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" and is more than a "mere scintilla" of the evidence but less than a preponderance.  *Id.* (internal quotation omitted).  The court must uphold the ALJ's findings if they "are supported by inferences reasonably drawn from the record[,]" even if the evidence is susceptible to multiple rational interpretations.  *Id.*

## THE ALJ'S DECISION

Garcia has major depressive disorder, post-traumatic stress disorder ("PTSD"), cognitive disorder (not otherwise specified), alcohol dependence (in alleged remission), and amphetamine dependence (in alleged remission).  The ALJ found these impairments, either singly or in combination, did not meet or medically equal the requirements of any of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  Instead, the ALJ concluded Garcia has the residual functional capacity ("RFC") to perform the full range of work at all exertional levels, but with the following nonexertional limitations:  claimant can perform simple, routine, repetitive work; she cannot sustain concentration, persistence, and pace for more complex tasks; she should not work with the public; she should only have brief, minimal interaction with co-workers and supervisors; she would need a predictable work environment.  Given these limitations, the ALJ concluded Garcia could return to her past work as a small products assembler.  The ALJ also made a finding that Garcia could perform other work in the national economy, including

electronics worker, laundry folder, and cannery worker. Given these findings, the ALJ opined Garcia is not disabled under the Act.

## FACTS

Garcia, who was 34 years old on the day she filed her SSI application, dropped out of high school in the eleventh grade as a result of a pregnancy. Her work history is limited. Her longest job, assembling boat parts, lasted six to eight months. She lost the job because she was drinking, was anxious, and stopped showing up to work. Garcia has three children, only one of whom lives with her. She lives in section 8 housing, receives assistance from TANF, and receives food stamps.

Cascadia Behavioral Health provided counseling services, both individual and in a group setting, beginning in early 2009 and continuing up until the ALJ's decision in 2013. Garcia also received counseling and services from LifeWorks NW from September 2009 through September 2011, and group therapy for two months at the end of 2011. Garcia used methamphetamine, drank alcohol, and was involved in multiple abusive relationships. In September 2009, LifeWorks staff discussed Garcia's goals with her, which included finding work and getting a GED, and helped Garcia get clothing for her daughter and items for her apartment. Staff helped her get her Oregon ID card, provided community resource information, gave her a list of churches and organizations providing food boxes, and helped enroll her daughter in school.

Meanwhile, a Cascadia counselor helped Garcia find housing, including transporting her to and from the landlord's office to complete and sign the paperwork, and assisted her in furnishing the place. In addition, a counselor helped Garcia pick up her son from the train station during his visit to Oregon in July 2010. When Garcia had to get her son back to the train station

a week later, she called and learned the counselor could not take him; they discussed MAX transportation options.

In early 2011, Garcia admitted needing to return to a depression group, or a relationship group. She reported crying, keeping the blinds pulled down, yelling at her daughter and telling her to go to her room and leave her alone in March 2011. Tr. 213.

In August 2011, Garcia reported last using methamphetamine in June 2011, and was drinking three times per week; she did not see alcohol as a problem for her. She began attending group sessions at Lifeworks in September 2011, but stopped coming "without explanation" in November 2011. She successfully quit drinking during those two months, but there was some belief that she did so only to satisfy Department of Human Services, which had a case open on her due to a domestic violence incident while her daughter was home. Tr. 756.

Garcia's Cascadia counselor, Gladys Howard, accompanied Garcia to the court proceedings involving Garcia's boyfriend. Howard also helped Garcia request reconsideration of her social security denial. As of August 2011, Garcia's diagnoses were alcohol dependence, amphetamine abuse, major depressive disorder, and posttraumatic stress disorder. Howard agreed to help create a calendar to organize Garcia and keep track of all of her appointments. Garcia reported at one point getting paperwork regarding her son and child support that she was just throwing away; Howard urged Garcia to bring it in so Howard could find out what was being asked of Garcia. When Garcia lost her bus pass, Howard agreed to call TriMet and set up bus tickets for Garcia. By December 2011, Garcia's diagnoses were major depressive disorder and posttraumatic stress disorder. Garcia still had not obtained her GED.

In January 2012, Garcia confessed to yelling at her daughter and their dog, and feeling bad about that. Seroquel helped her sleep, but made her irritable; Wellbutrin was insufficient to stablizize her mood. Her provider exchanged those medications with Viibryd and Doxepin. In February 2012, Garcia reported drinking occaionally in moderate amounts. She switched to Prozac. She reported feeling well in March. In May, Howard discussed different housing options for Garcia since Garcia's ex-boyfriend's family had moved in nearby. She was excited to attend her son's high school graduation in California, but a week later she reported she had changed her mind as she did not want to be around her family. In June, Garcia was arrested for a night for disorderly conduct as a result of an altercation with a neighbor. She had started to look for new housing but got overwhelmed. Her punishment for the disorderly conduct was 24 hours of community service for Habitat for Humanity, which she completed before the deadline. She missed a group meeting in September because her bus was late. In October, Garcia told her counselor she had been doing small odd jobs at her apartment complex with the maintenance person. Things were going well in November, but she requested assistance in completing the annual packet of forms for Department of Human Services for continued food stamps and medical care. She felt increased irritability and requested a medication review. At her December mental health assessment, Garcia reported bouts of depression, difficulty sleeping, and some symptoms of anxiety. She was "engaging and personable" but felt she did not have enough to do during the day; she felt fear when leaving home. She had developed a small group of friends in the apartment complex. Her mood and affect were euthymic and blunted, but she had average intelligence, was goal-directed, and she paid attention.

During the first few months of 2013, Garcia lacked motivation and had trouble getting up in the morning; she was still interested in taking the GED, but she became tearful when describing her struggles in helping her child with homework. Garcia missed her April counseling session when she forgot to call TriMet for a bus pass. She wanted all of her children to visit during the summer. In May, she was tearful about her daughter's poor performance at school and needing to discipline her; she spent her Mother's Day sleeping while her daughter was at a neighbor's house. Garcia's oldest daughter came to visit for the summer and Howard agreed to research free summer activities for her and get some bed sheets donated. In August, after Garcia had been sick with cold symptoms for weeks, Howard helped her make an appointment to see her primary care physician. Garcia had a nice visit from her mother later that month, and went on a bike ride with her daughter.

In mid-September 2013, Garcia became tearful about her GED, saying she was having trouble understanding the material. In addition, she had been in an altercation with a man and the police were called; she told the police the man had hit her when he had not. She reported crying for no reason, but did say she had been attending church. She was working toward getting her driver's license. Just before her hearing, she was donating plasma twice a week for money, and she discussed with Howard how to obtain donated children's clothing for her daughter. She requested advice about planning for her daughter's birthday, and at the urging of Howard called the school to confirm she could not make homemade cupcakes. When Garcia's social security hearing was scheduled, Howard helped her plan her route and encouraged her to practice getting to the site the day before; Howard attended the hearing with her.

Howard submitted a letter dated October 22, 2013 on behalf of Garcia in which she described Garcia as "profoundly incapacitated by her symptomology" caused by her major depression disorder. Howard pointed out Garcia's failed attempts to get her GED as evidence of her impairment, and commented that Garcia "has survived on basic skills to function and take care of [her] elementary age child." Tr. 984.

Additionally, Garcia met with an occupational therapist named Two Foxes Singing, who opined that, after interviewing Garcia, she appeared anxious, confused, and had difficulty maintaining attention and concentration. The therapist had to repeat questions. Garcia did not leave her house independently, she avoided eye contact, had difficulty conversing, and avoided social situations. He thought she demonstrated poor problem solving.

Finally, Garcia's prescription provider at Cascadia submitted a statement in which she agreed with the diagnoses and assessment of Linda Fishman, Ph.D., described below.

## DISCUSSION

Garcia principally challenges the ALJ's treatment of two medical opinions: a psychological evaluation performed by Linda Fishman, Ph.D. and a psychological examination performed by Molly McKenna, Ph.D. In addition, Garcia contends the ALJ did not adequately account for her moderate impairments in concentration, persistence and pace in crafting the RFC. I do not need to reach the latter argument.

I.   Medical Opinions

The weight given to the opinion of a physician depends on whether the physician is a treating physician, an examining physician, or a nonexamining physician. More weight is given to the opinion of a treating physician because the person has a greater opportunity to know and

observe the patient as an individual. *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007). If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons. *Id.* (treating physician); *Widmark v. Barnhart*, 454 F.3d 1063, 1067 (9th Cir. 2006) (examining physician). Even if it is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record. *Orn*, 495 F.3d at 632; *Widmark*, 454 F.3d at 1066. The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician. *Widmark*, 454 F.3d at 1066 n.2.

Because the opinions of both Dr. Fishman and Dr. McKenna were contradicted by state agency consultant Dorothy Anderson, Ph.D., the ALJ was required to give specific and legitimate reasons for only partially crediting their opinions.

    A.    <u>Dr. Fishman</u>

Central City Concern referred Garcia for a psychological evaluation in October 2011, performed by Dr. Fishman. Dr. Fishman reviewed Dr. McKenna's opinion (discussed below), mental health notes from Cascadia, and notes from LifeWorks. Garcia arrived with her case manager, but completed the paperwork on her own. Dr. Fishman's testing revealed Garcia's full scale IQ was 75, although she noted Garcia's cognitive abilities varied enough that her scores were not representative of her abilities. Dr. Fishman specifically noted very low scores in delayed memory, suggesting deficits in learning new skills, tasks, and information. Dr. Fishman thought Garcia's PTSD would affect her ability to focus on job training and performance, learning new work tasks, working with co-workers and supervisors, and receiving feedback. Dr.

Fishman noted Garcia's difficulty leaving home, unless accompanied by someone she knew, which would make it difficult for her to get to work.  Additionally, Garcia's memory and processing speed made it difficult for her to remember new tasks and instructions.  Dr. Fishman diagnosed PTSD, major depressive disorder, cognitive disorder not otherwise specified, alcohol dependence in early full remission, and amphetamine abuse in early full remission.  She did not think a diagnosis of learning disorder was supported by the test data.

Dr. Fishman completed a mental residual functional capacity form in which she opined Garcia's ability to remember locations and work-like procedures was "moderately severe" and her ability to understand, remember, and carry out short and simple repetitive instructions was "moderate[ly]" impaired.  Tr. 733.  Garcia's ability to maintain attention for two straight hours was "moderately severe," but her ability to work in coordination with others without distraction was "severe" as was her ability to understand, remember and carry out detailed instructions.  Tr. 734.  Garcia was moderately impaired in her ability to sustain an ordinary routine and make simple work-related decisions.  Additionally, Garcia was moderately severely impaired in her ability to ask questions or get help from a supervisor, get along with coworkers, and respond appropriately to changes at work.  She was severely impaired in her ability to travel in unfamiliar settings and use public transportation.  The form defined "moderate" to mean the activity could be accomplished one third to two thirds of the day, while moderately severe meant the activity could be done no more than two hours in an eight hour day.  Severe meant the activity was totally precluded on a sustained basis.

The ALJ gave "some weight" to Dr. Fishman's opinion.  He accepted that Garcia would be limited to performing simple tasks, and should have limited public and co-worker contact.  He

Page 12 - OPINION AND ORDER

noted, however, that "Dr. Fishman's description of the degree of limitation ('slight or none'–'moderate'–'moderately severe'–'severe') is not the terminology currently used under the regulations." Tr. 29.  As Garcia points out, this is not a specific and legitimate reason to discount Dr. Fishman's opinion as the ALJ should have referred to the descriptions rather than the labels alone.  Further, the ALJ questioned Dr. Fishman's opinion as to the severity of Garcia's limitations on working through a normal workweek, adapting to change, and traveling.  He pointed to Garcia's activities of being a single parent, hosting her second daughter during the summer, and attending individual and group counseling sessions each week.  However, the ALJ neglected to recognize the amount of assistance Garcia required to accomplish these things, such as help obtaining clothing for her daughter, lists of summer activities, food boxes, scheduling appointments, and accompaniment to appointments and court proceedings.  Indeed, at her June 2011 appointment, Garcia confessed that she had experienced her third contact from child protective services.  Tr. 528.

In addition, Garcia did not regularly attend her appointments in person; she often cancelled, had the appointment by phone, or her counselor met with her in Garcia's home.  For example, during the months of April through June 2010, Garcia left her home for counseling three times in April, twice in May and twice in June.  Tr. 468-489, 643-44 (in person 4/1, on the phone 4/7, cancelled 4/8, appeared for her individual and group sessions in person 4/12, on phone 4/13, cancelled 4/15, appeared for group therapy 4/19, no showed 4/22, called 4/26, met with her counselor in her home 4/30, called 5/3, met in person 5/4, on the phone 5/6, cancelled 5/13, met in her home 5/17, appeared in person 5/20, cancelled 6/10, on the phone 6/15, met in person 6/21 and 6/29).  In fact, Garcia was required to attend a Commitment to Change group in

Page 13 - OPINION AND ORDER

June and July 2011 for cancelling her appointments. Tr. 654-59. Her appointment schedule was heaviest when she was required by Department of Human Services and the court to attend drug and alcohol counseling through LifeWorks in September and October 2011, after she and her ex-boyfriend were involved in a domestic violence incident. Tr. 700, 934.

The ALJ incorrectly reported that Garcia traveled to California to see her son graduate, when she ended up not going, and improperly relied on her travel to California to care for relatives ten months before her alleged onset date of disability. Tr. 894, 421. The ALJ also implied that Garcia's involvement in "several relationships" was a sign of non-impairment, when her relationships have been abusive.

In sum, Dr. Fishman's opinion was based on test results, a review of all of Garcia's treatment notes and was consistent with the overall weight of the evidence. The ALJ's decision to give partial weight to Dr. Fishman's opinion is simply not supported by substantial evidence.

B.      Dr. McKenna

Dr. McKenna examined Garcia on November 23, 2009 and again on December 14, 2009 at the request of the Department of Human Services Self-Sufficiency Office and Steps to Success. The department specifically asked Dr. McKenna to gauge Garcia's ability to be employed, retrained, or to work with Vocational Rehabilitation. Dr. McKenna recorded that Garcia's driver's license was suspended for traffic violations, that she took the bus, but she did not like public transportation and would prefer to walk. Her typical day involved watching television, attending appointments, and caring for her daughter. She could cook pork chops and fried chicken, but she had trouble following a recipe. She shopped, cleaned, and did laundry.

Garcia reported depression, crying spells, not wanting to leave the house, poor memory, and difficulty sleeping.

Testing revealed Garcia's full scale IQ is 75, at the fifth percentile. Dr. McKenna noted variable cognitive skills, with a much stronger visuospatial organization ability and psychomotor processing speed. Garcia had "extremely poor scores" on reading and listening comprehension. Tr. 269. Dr. McKenna diagnosed Garcia with major depressive disorder, PTSD, amphetamine dependence in sustained full remission, and learning disorder NOS (verbal comprehension disorder).

Dr. McKenna found Garcia was not limited in her daily life, as she "has managed independently on her own for several years." Tr. 273. Nevertheless, "[a]t this time, the primary impediments to returning this client to gainful employment are her posttraumatic symptoms, discomfort with other people and leaving the house, mild depressive symptoms, poor verbal comprehension, impaired verbal memory, low academic skills, and inconsistent employment history." Tr. 274. Dr. McKenna suggested she would be a "good candidate for repetitive, simple, physical tasks. However, she will need significant encouragement to persist in job-seeking, as well as assistance in assembling applications and completing paperwork to find a job." *Id.* Dr. McKenna noted a number of accommodations which would be necessary in an education or employment setting, including physical demonstration of job duties, double checking to make sure Garcia understood her job, checklists, work tasks broken into small steps, repeated instructions, and a job coach or close supervision during training to model work tasks. Dr. McKenna thought Garcia would be a "good candidate for positions in production, assembly

or other physical, repetitive tasks. She is a good candidate for overlearned and familiar tasks that build off skills she already has, such as personal care, cooking, or janitorial work." Tr. 276-77.

The ALJ gave some weight to Dr. McKenna's opinion. He accepted that Garcia could perform simple, repetitive tasks with limited social interactions. He rejected Dr. McKenna's suggestion that Garcia would need repeated instructions, help with paperwork, checklists, and extra time, finding that there was no need for these accommodations if Garcia were limited to simple, repetitive work. He also concluded Dr. Fishman's finding that a learning disorder diagnosis was unwarranted undermined Dr. McKenna's recommendations for extra time and help.

The ALJ's interpretation of Dr. McKenna's opinion is not supported by substantial evidence. Dr. McKenna specifically identified the accommodations which would be required in order for Garcia to perform the simple, repetitive physical tasks. Tr. 274 ("She will need accommodations for her verbal comprehension difficulties, as listed below."). Further, regardless of the official diagnosis (cognitive disorder versus learning disability), Dr. McKenna's opinion was consistent with Dr. Fishman's opinion on the issue of Garcia's difficulty in learning and remembering new work tasks.

II.     Remedy

The court has the discretion to remand the case for additional evidence and findings or to award benefits. *McCartey v. Massanari*, 298 F.3d 1072, 1076-77 (9th Cir. 2002). The court has discretion to credit evidence and immediately award benefits if the ALJ failed to provide legally sufficient reasons for rejecting the evidence, there are no issues to be resolved before a determination of disability can be made, and it is clear from the record that the ALJ would be

Page 16 - OPINION AND ORDER

required to find the claimant disabled if the evidence is credited. *Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014). Alternatively, the court can remand for further proceedings "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Id.* at 1021.

I agree with Garcia that the ALJ failed to provide legally sufficient reasons for rejecting the opinions of Dr. McKenna and Dr. Fishman. Both opinions were based on their own testing and medical assessments, corroborated each other, corroborated the other treating and examining providers, and Dr. Fishman's examination was performed while Garcia was sober. Since neither examining physician relied "to a large extent" on Garcia's statements, the ALJ's adverse credibility finding is irrelevant. *See Trnavsky v. Colvin*, __ F. App'x __, 2016 WL 146007 (9th Cir. Jan. 6, 2016) (unpublished) (citing *Tommasetti v. Astrue*, 533 F.3d 1035, 1037, 1049-41 (9th Cir. 2008)). The ALJ failed to offer specific and legitimate reasons for crediting the opinion of a non-treating, non-examining doctor over all the other opinions of the treating and examining providers.

The next question is whether there are any issues to be resolved. The Commissioner argues only that there is serious doubt whether Garcia is disabled. I do not agree. Crediting Dr. Fishman's opinion, Garcia is substantially impaired in her ability to remember locations and work-like procedures, maintain attention and concentration for two straight hours at a time, ask simple questions or request assistance from supervisors, get along with coworkers, maintain socially appropriate behavior in the workplace, and respond appropriately to expected changes in the work environment. Tr. 733-34. Dr. Fishman also thought Garcia is precluded from completing a normal workday and work week on a sustained basis. Tr. 734. Crediting Dr.

Page 17 - OPINION AND ORDER

McKennon's opinion, while Garcia could perform simple, repetitive, physical tasks, she would need repeated contact with her supervisor to make sure she could recall presented information, she would need close supervision during training to model work tasks for her, and she would need to use memory aids on the job.  Given these opinions, and Social Security Ruling 85-15, a finding of disability is appropriate here because the evidence demonstrates Garcia shows a substantial loss of various work-related abilities.  1985 WL 56857, at *4.  As a result, a remand for a finding of disability is appropriate where the ALJ would be required to find Garcia disabled.

## CONCLUSION

The decision of the Commissioner is reversed.  The case is remanded for a finding of disability.

IT IS SO ORDERED.

DATED this ___11th___ day of February, 2016.

     /s/ Garr M. King
Garr M. King
United States District Judge